## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DINA L. KOVACH, | Civ. No. 15-6999 (KM) |
| Plaintiff, | |
| v. | OPINION |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

### KEVIN MCNULTY, U.S.D.J.:

Dina Kovach brings this action to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Title II Disability Insurance Benefits ("DIB"). Upon reviewing and weighing certain evidence, the Administrative Law Judge ("ALJ") concluded that Kovach was not disabled from June 12, 2010, through March 19, 2014, the date of the decision. Kovach claims the ALJ's decision is not supported by substantial evidence.

Because I find that the ALJ improperly failed to consider certain probative evidence supporting Kovach's allegations of severe pain and also failed to incorporate certain of Kovach's physical limitations into the hypothetical posed to the vocational expert, this Court will remand for further proceedings.

### I. BACKGROUND

Kovach applied for DIB pursuant to Sections 216(i) and 223(d) of the Social Security Act ("SSA") on December 1, 2011, alleging disability as of June

1

12, 2010 (R 172–175). Kovach's application was denied initially (R 118–122)[1] and on Reconsideration (R.126-128). Kovach requested a hearing before an Administrative Law Judge (an "ALJ") to review her application de novo (R.129-130). A hearing was held on November 21, 2013, before ALJ Elias Feuer, who issued a decision on March 19, 2014. ALJ Feuer denied disability at step five of the sequential evaluation, on the ground that, although Kovach could no longer perform her past relevant work, she is capable of adjusting to sedentary work that accommodates her limitations and exists in significant numbers in the national economy. (R12–22).

Kovach requested Appeals Council Review of ALJ Feuer's decision, but her request was denied on July 30, 2015. This denial rendered ALJ Feuer's decision the final decision of the Commissioner. (R 1–11) Kovach now appeals that decision, pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.    DISCUSSION

### A. Five-Step Process and this Court's Standard of Review

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423. To qualify, a claimant must show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(c), 1382(a).

Under the authority of the SSA, the Social Security Administration (the "Administration") has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 CFR §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process, which is prescribed by regulation. The steps may be briefly summarized as follows:

---

[1]      Pages of the administrative record (ECF No. 6) are cited as "R _." Pages of the Plaintiff's Brief (ECF No. 11) are cited as "Br _." Pages of the Commissioner's brief (ECF No. 13) are cited as "Opp _."

2

**Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 CFR §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the severe impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 CFR Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is automatically eligible to receive disability benefits (and the analysis ends); if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**RFC and Step 4:** Determine the claimants "residual functional capacity," (the "RFC") meaning "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). *Caraballo v. Comm'r of Soc. Sec.*, No. 2:13-CV-07187 KM, 2015 WL 457301, at *1 (D.N.J. Feb. 3, 2015). Decide whether, based on her RFC, the claimant can return to her prior occupation. 20 C.F.R. § 1520(a)(4)(iv); *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the Social Security Administration to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 CFR §§ 404.1520(g), 416.920(g); see *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

For the purpose of this appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). The factual findings of the ALJ are reviewed "only to determine whether the administrative record contains substantial evidence supporting the

findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007) (not precedential). Outright reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221–222; *Morales v. Apfel,* 225 F.3d 310, 320 (3d Cir. 2000).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 F. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable.") (not precedential). It is also proper to remand where the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted).

4

### B. The ALJ's Decision

ALJ Feuer undertook the five-step inquiry. His conclusions are summarized as follows:

### Step 1

Although Kovach attempted to work after the alleged onset of disability, that work was an unsuccessful work attempt because Kovach was terminated after approximately two months. Therefore, the ALJ found that Kovach had not engaged in substantial gainful activity from the alleged onset date of June 12, 2010, through the date of her hearing—March 19, 2014. (*see* R 17, 22)

### Step 2

Kovach had the following severe impairments: Somatoform disorder, spine disorder and depression. (R 17) Kovach had additional impairments as well, but these were determined to be non-severe, based on medical evidence or a lack thereof, as follows: (1) a heart condition, based on diagnostic evidence of normal coronary arteries and left ventricular functions; (2) fibromyalgia, for which the ALJ stated that no supporting medical records existed; and (3) a seizure disorder, marked by an isolated seizure episode controlled by medication. (*Id.* 18).

The ALJ also acknowledged medical records from Kovach's inpatient and emergency room treatment during the July 2009 through June 2011 period for various illnesses not related to Kovach's disability claim, including a hospitalization for pneumonia and chest pain syndrome. (*Id.*)

### Step 3

With respect to Kovach's severe impairments, Kovach did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R 18). ALJ Feuer paid particular attention to medical listings 1.00 (Musculoskeletal System) and 12.00 (Mental disorders).

First, ALJ Feuer declined to find that Kovach's impairments met the criteria for medical listing 1.04 (Disorders of the spine) due to lack of evidence supporting the listing's requirement of "spinal stenosis, nerve root or spinal

cord compression . . . with sensory or reflect loss, spinal arachnoiditis or pseudoclaudication . . . ."[2] (*Id.*)

Second, ALJ Feuer declined to find that Kovach's mental impairment was severe enough to meet the criteria of medical listings 12.04 and 12.07 because the "paragraph B" criteria were not satisfied—that is, Kovach's "mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (*Id.* (quoting medical listing 12.00))[3] In particular, he found that

_____

[2]    1.04 Disorders of the spine requires the following:

[C]ompromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

https://www.ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm#1_04.

[3]    A claimant's affective disorder meets or medically equals listing 12.04 (Affective Disorders) when it either satisfies both the paragraph A and paragraph B criteria, or satisfies the C criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04.

To satisfy the paragraph A criteria, a claimant must, in essence, medically document the persistence of depressive, manic, or bipolar syndrome. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04. To satisfy the Paragraph B criteria of listing 12.04, a claimant must demonstrate that his affective disorder results in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

Kovach had only moderate restriction in daily living activities. The record showed that Kovach reported difficulty lifting her legs while dressing, an inability to stand in the shower, and an ability to fix only quick meals. (*Id.* 19) Additionally, the ALJ found that Kovach had only mild difficulties with social functioning, as Kovach reported maintaining a close relationship with her mother and sisters and attending activities with her children. (*Id.*) Further, the

---

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

*Id.*

   "'Marked' as a standard for measuring the degree of limitation . . . means more than moderate but less than extreme." *Id.* § 12.00. Activities of daily living include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *Id.* Sec. 12.00C(1). Analysis of a claimant's activities of daily living involves an assessment of the "quality of these activities by their independence, appropriateness, effectiveness, and sustainability," and the extent to which a claimant is "capable of initiating and participating in activities independent of supervision or direction." *Id.*

   Listing 12.04, Paragraph C requires:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and" any of three symptoms: 1) repeated episodes of decompensation; 2) a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in environment would cause the individual to decompensate; or 3) a history of one or more years' inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). *See generally Trzeciak v. Colvin,* No. CV 15-6333 (KM), 2016 WL 4769731, at *7 (D.N.J. Sept. 12, 2016).

   To meet or medically equal Listing 12.07 (Somatoform Disorders), a claimant must medically document, in essence, (A) (1) symptoms of altered voluntary motor or sensory function, (2) one or more distressing somatic symptoms, or (3) preoccupation with having or acquiring a serious illness even though significant symptoms are not present; *and* the same "Paragraph B" criteria as for medical listing 12.04, *supra.* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07; *see also* https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.

ALJ found only moderate difficulties with Kovach's concentration, persistence, or pace: Kovach claims she is unable to focus and concentrate, but a consultative examiner's notes reported Kovach's ability to perform simple mathematical activity. (*Id.*) Finally, the ALJ noted that Kovach has had no episodes of decompensation, although Kovach reported that she does not handle stress or changes to routine well. (*Id.*)

ALJ Feuer noted that, when formulating Kovach's RFC assessment in the next stage of the analysis, he considered the degree of limitation he found in Kovach's mental function analysis with respect to the "paragraph B" criteria. (*Id.*)

### RFC and Step 4 – Ability to Perform Past Work

Next, ALJ Feuer defined Kovach's RFC:

> **[T]he claimant has the residual functional capacity to perform less than a full range of sedentary work. The claimant can occasionally lift 10 pounds, frequently lift 5 pounds, stand and/or walk 2 hours in an 8 hour work-day, sit less than 6 hours in an 8 hour work-day. The claimant can never climb ladders, but can occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl and must avoid dangerous machinery and unprotected heights and is limited to simple, routine and repetitive tasks.**

(R 19).[4]

ALJ Feuer began his RFC analysis by explaining that he followed a two-step process in which he first determined whether Kovach had an underlying medically determinable physical or mental impairment "that can be shown by

---

[4]    The Social Security Administration defines "sedentary work" as involving:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce [Kovach's] pain or other symptoms." (R 20) He then explained that in the second step, he "must evaluate the intensity, persistence, and limiting effects of [Kovach's] symptoms to determine the extent to which they limit [her] functioning." (*Id.*) To do this, he explained, he was required to look to objective medical evidence, or to the entire case record where objective medical evidence does not substantiate Kovach's statements about "the intensity, persistence, or functionally limiting effects of pain or other symptoms." (*Id.*)

ALJ Feuer next presented his conclusion that, although he found Kovach to suffer from medically determinable impairments "reasonably expected to cause [her] alleged symptoms[,] . . . [he found her] statements concerning the intensity, persistence and limiting effects of these symptoms [] not entirely credible . . . ." (*Id.*) He then explained how he arrived at this conclusion.

ALJ Feuer first credited the report of Dr. Potashnik, an orthopedic consultative examiner who "could not discern any organic basis for claimant's multiple complaints," and two psychological consultative examiners who "suggest[ed] the need for limitation to unskilled work." (R 20; *see* R 566–570; 667–670)

He next acknowledged Kovach's testimony that during the time she collected unemployment after the alleged onset of her disability, she "continued to search for work, which she . . . would have accepted." (R 20) Citing Kovach's "activities of daily living and ability to care for her dog," the ALJ determined that Kovach could perform the unskilled jobs that the vocational expert ("VE") offered during Kovach's hearing.[5]

---

[5]     Although Kovach does not challenge this aspect of the ALJ's decision, I note that his consideration of Kovach's ability to perform jobs offered by the VE was premature at the RFC/step four stage; whether a claimant is capable of adjusting to other work is a question for step five.

The ALJ then returned to Kovach's objective medical record, remarking that several MRI results from the 2008 through 2012 time period revealed "foraminal narrowing, but no nerve impingement." (*Id.*)

Next, the ALJ returned to Kovach's daily living activities, reviewing Kovach's testimony that she could walk 8-10 steps in her house, take care of her children with the help of her parents, make meals for her family, perform light housekeeping, and walk and drive her kids to school. (*Id.*)

ALJ Feuer concluded his analysis by pointing out that no medical opinion Kovach submitted stated that Kovach could not perform sedentary work, and explaining that he gave "significant weight to the state agency medical consultants who opined that [Kovach] is limited to routine sedentary work." (*Id.*)

Based on these findings, at step four, ALJ Feuer concluded that Kovach was unable to perform her past relevant work because it exceeds her RFC.[6]

## Step 5

At step five, ALJ Feuer explained that there are nonetheless "jobs that exist in significant numbers in the national economy that [Kovach] can perform," based on her age, education, work experience, and RFC. (*Id.* 21) Accordingly, he found that Kovach is not disabled under the SSA. (*Id.* 22)

To make this determination, ALJ Feuer relied on the testimony of a VE, who testified that Kovach would still be able to perform the following occupations: order clerk (Dictionary of Occupational Titles ("DOT") #209.567-014, sedentary, svp 2, 190,000 jobs available nationally); envelope addresser (DOT #209.587-010, sedentary, svp 2, 150,000 jobs available nationally); and

---

[6]     At Kovach's hearing, the VE testified that an individual who could only perform a sedentary occupation could not work at Kovach's past job as a receptionist, as performed. (R 72) Kovach had testified that she spent roughly six hours of an eight-hour day on her feet and frequently lifted 10-25 pounds in her last successful position as a greeter and receptionist at a car dealership. (R 32–35) Prior to that, Kovach's job at a gym involved similar physical demands. (*see* R 31–32) The position she held after working as a greeter and receptionist was less physical but did not last long enough to be considered substantial gainful activity appropriate for consideration. (*See* R 17, 36–37, 57, 72)

preparer (DOT #700.687-062, sedentary, svp 2, 140,000 jobs available nationally).

The VE gave this testimony in response to hypotheticals the ALJ posed about Kovach's limitations. Because a portion of Kovach's appeal turns on the content of those hypotheticals, I quote the relevant portions of the hearing transcript here:

> Q: . . . . I'd like you to assume an individual of the same age, education, and experience as the claimant. For the first hypothetical, I'd like you to presume that the individual can frequently lift 20 pounds, occasionally lift 10 points; can stand two hours, sit six hours; would never be required to climb ladders, but could occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl; and would avoid exposure to dangerous machinery and unprotected heights. . . .
>
> . . . .
>
> Q. And if I reduced the hypothetical to sedentary, which – would the hypothetical individual be able to do past work?
>
> . . . .
>
> Q. And if I modify that hypothetical to unskilled work because of concentration problems associated with pain or the effects of pain medication, would there be jobs in the national economy?

(R 72–73)

It was in response to the second hypothetical—which simply told the VE to consider an individual capable of performing sedentary work—and again to the third hypothetical—which further limited the second hypothetical—that the VE opined that Kovach could perform the three unskilled, sedentary occupations listed *supra*. (*See id.*)[7]

---

[7]     The ALJ further posed a fourth hypothetical, which added to the third hypothetical the assumption that the individual would be late an average of 20 minutes per day three times per week. (R 74) To this, the VE testified that the individual would not be capable of performing any jobs available in the national economy. (*Id.*) Kovach's appeal does not argue that the ALJ should have relied on the VE's response to this fourth hypothetical.

### C. Kovach's Appeal and Analysis

#### 1. Eight-hour workday

Kovach argues first that "[a]n individual who cannot, by reason of impairments, perform an eight hour workday cannot be denied disability." (Br 9) This argument relies on Kovach's RFC, which provides that Kovach is capable of standing and/or walking for two hours in an eight hour workday but sitting for "less than six hours in an eight hour workday." (*Id.* (quoting R. 19)) Based on this limitation, Kovach appeals to basic arithmetic: "2 + 6 = 8. But 2 + < 6 = < 8" (Br 10) (Apparently breaks were not considered.) Accordingly, she argues, she is necessarily owed disability benefits. But Kovach cites no law, rule, or interpretation by the Administration to support the notion that an individual who cannot complete an eight-hour workday is necessarily disabled.

The Administration has explained that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," and that "[a] 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims,* SSR 96-8P (S.S.A. July 2, 1996). "Equivalent work schedule" is not defined, but by its plain meaning, I read it to mean a forty-hour work week compressed to fewer or extended to more than five days. The Administration has also advised that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be *eroded.*" *Titles II & Xvi: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work,* SSR 96-9P

12

(S.S.A. July 2, 1996) (emphasis added).[8] Further, "[i]f the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience." *Id.*

These instructions indicate that a claimant's inability to work an eight-hour day or to otherwise perform the full range of sedentary work does not automatically render her disabled. Therefore, Kovach's first argument is unpersuasive.

### 2.    First hypothetical

Kovach's second argument is that ALJ Feuer posed only the following hypothetical to the VE: "the individual can frequently lift 20 pounds, occasionally lift 10 pounds; can stand two hours, sit six hours . . . ." (R. 72) Kovach says this hypothetical is "simply silly," because "if the person can only lift 10 pounds 1/3 of the day it may seem impossible for the same individual to lift 20 pounds 2/3 of the day." It also, she says, bears little resemblance to Kovach's actual, more limited RFC as found by the ALJ. (Br 14–15) Kovach contends that "[t]here is no question that the jobs recited by the VE were delivered in response to a different RFC and not to the one found in the decision," and therefore concludes that the ALJ's decision to deny benefits rested on an improper basis. (*Id.* 15–16)

The Commissioner fails to respond to this argument, but it does not require much response. Kovach's second argument entirely ignores the three hypotheticals the ALJ subsequently posed to the VE. (*See supra* p.11; R 72–73) The second and third hypotheticals formed the basis for the VE's relevant testimony. Therefore, Kovach's second argument fails as well.

---

[8]    The Administration has also noted that "[t]he ability to work 8 hours a day for 5 days a week is not always required when evaluating an individual's ability to do past relevant work at step 4 of the sequential evaluation process. . . . an individual who retains the RFC to perform [past part-time work that was substantial gainful activity] work must be found not disabled." SSR 96-8P n.2.

### 3.   RFC

Kovach's third argument has more traction. Kovach claims ALJ Feuer failed to recite all probative evidence and to articulate any analysis of that evidence in his decision, instead engaging only "in a blanket recitation of the evidence followed by an announcement of plaintiff's RFC." (Br 17–19 (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).[9]

Specifically, Kovach claims that ALJ Feuer did not sufficiently consider or incorporate into the RFC evidence of the following: Kovach's spinal disorder; "chronic pain behaviors"; cervical and lumbar radiculopathy;[10] range of motion limitations caused by cervical disc herniations; major depression, pain, anxiety, and adjustment disorders with a Global Assessment Functioning score of 50 (indicating the presence of "serious symptoms"); Kovach's need for epidurals, TENS unit treatments, and various prescription drugs; nerve damage and pain; fibromyalgia; and poor concentration limiting her ability to manage finances. (Br 28)

Kovach especially notes evidence of moderate limitations in her ability to maintain concentration, persistence, or pace. She argues that the ALJ addressed these limitations only by way of a vague restriction to "simple routine and repetitive tasks" in the RFC. (*Id.*) In response, the Commissioner

---

[9]    In *Burnett*, the Third Circuit reasoned that "[a]lthough the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." 220 F.3d at 121. In *Cotter*, the Third Circuit explained: "we need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." 642 F.2d at 705. This instruction applies to medical and non-medical evidence alike. *Id.* at 122. In both cases, the Third Circuit reversed and remanded for the ALJ's failure to mention or refute contradictory medical evidence in the claimant's record.

[10]    ALJ Feuer noted that orthopedic consultative examiner Dr. Potashnik concluded in March 2012 that Kovach "has multiple musculoskeletal complaints, chronic pain behavior but no evidence of radiculopathy." (R 17) I note, however, that while Dr. Potashnik's report states that Kovach's records show "no *clear* evidence of radiculopathy," (R 570) the report does acknowledge Kovach's history of radiculopathy in 2005, which was treated surgically (R 569).

recites the evidence the ALJ did discuss, and argues that ALJ Feuer "articulated why the relevant evidence, including Plaintiffs' treatment history, the medical opinions, and her statements and self-reported activities, supported the RFC finding." (Opp 12–14)

Additionally, the Commissioner claims Kovach's moderate mental limitations did not need to be addressed more specifically in the RFC because state agency experts confirmed Kovach's ability to perform simple and routine unskilled work. And, the Commissioner argues, "moderate limitations assessed in the broad areas of functioning at step three are not required to be transcribed verbatim in the RFC and hypothetical question." (Opp 15) The Commissioner cites *Hux v. Astrue,* No. CIV.A. 11-1306, 2012 WL 4498845, at *6 (W.D. Pa. Aug. 27, 2012), *report and recommendation adopted,* No. CIV.A. 11-1306, 2012 WL 4507067 (W.D. Pa. Sept. 28, 2012), where the court explained:

> The "moderate" limitations in . . . activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence or pace were only relevant for the purpose of determining *whether* the ALJ needed to make a residual functional capacity finding in the first place. 20 C.F.R. § 416.920a(d) (1)-(3). They had no direct bearing on the *content* of that finding. The assessment of a claimant's residual functional capacity must account for all "physical and mental limitations" that have an impact on what he or she "can do in a work setting." 20 C.F.R. § 416.945(a)(1).

As the Commissioner points out "'moderately limited' means only that the individual's ability to perform the particular activity is 'impaired,' not that it is 'unacceptable in the national workforce.'" (Opp 16 (quoting *Smith v. Comm'r of Soc. Sec.,* 631 F.3d 632, 636-37 (3d Cir. 2010)).

The parties' arguments somewhat conflate the ALJ's RFC determination with the hypothetical he posed to the VE, but set that aside. The question presently before me is this: did ALJ Feuer explicitly evaluate and weigh all relevant and probative medical and non-medical record evidence, explaining

his rejection of any pertinent evidence, such that substantial evidence supports the ALJ's determination of Kovach's RFC? *See Wise v. Comm'r of Soc. Sec.*, 626 F. App'x 357, 359 (3d Cir. 2015) (non-precedential); *Adorno*, 40 F.3d at 48.

With respect to Kovach's mental limitations, I agree with the Commissioner that the ALJ was not required to more explicitly incorporate into the RFC her moderate mental limitations. The case law requires a hypothetical question posed to a VE to reflect all of a claimant's specific limitations—mental and physical—where they are supported by established medical evidence. *See, e.g., Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002); *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). But here, I think the record substantially supports the conclusion that Kovach's mental limitations are moderate and non-specific. Such limitations are adequately addressed by limiting Kovach to "simple, routine and repetitive tasks" in her RFC. (R 17, 19–20; *see also* R 96–97, 114–115 (April and November 2012 mental RFC assessments reporting only non-significant or moderate limitations in mental functioning areas and concluding that Kovach can perform "in simple, low stress work settings."))[11]

---

[11]   *Cf. Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (ALJ's use of "simple repetitive one, two-step tasks" in hypothetical to VE did not sufficiently convey claimant's mental limitations where an ALJ had previously found claimant to suffer from "deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner (in work settings or elsewhere)."); *Burns*, 312 F.3d at 123 (distinguishing 8th Circuit case where "simple, routine, repetitive work" adequately accounted for deficiencies in a claimant's concentration, persistence, and pace, from the case before the Third Circuit, where the claimant's record showed several more specific mental deficiencies).

For clarity, I observe that, to challenge her RFC, Kovach relies on case law addressing the question of what limitations should be incorporated into a hypothetical given to a VE. This is acceptable, as challenges to a VE's testimony based on an allegedly inadequate hypothetical are "really best understood as challenges to the RFC assessment itself." *Rutherford*, 399 F.3d at 554 ("a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert.").

The real problem becomes apparent when we compare the record evidence of Kovach's physical symptoms and impairments with the ALJ's decision. It is evident that ALJ Feuer did not expressly evaluate or weigh records from Kovach's long-time treating pain management physicians or from Kovach's long-time treating rheumatologist, whose records I summarize as follows:

- June 2009 through December 2011 records from pain management specialist Dr. Binod Sinha show that Kovach considered medication to relieve her pain by 50%–80% (with self-reported relief decreasing over time). Dr. Sinha also reported that Kovach has tender spots and some reduced range of motion in the cervical spine. (R 478–565) Dr. Sinha provided Kovach with various drug prescriptions for her pain, as well as regular epidural injections and a TENS unit. (R 569)

- An October 2012 letter from Kovach's long-time treating rheumatologist, Alan S. Lichtbroun, reports that another pain doctor, Dr. Freedman, gave Kovach epidural injections, and that Kovach had "broad based disk herniation diffusely," "diffuse body pain" not ameliorated by epidural injections, limited neck flexion, sciatic pain in her legs, restless leg syndrome, and fatigue. A 2001 letter from Dr. Lichtbroun documents Kovach's fibromyalgia and attendant tender points, chronic headaches, back pain, history of panic attacks, and asthma. (R 607–608) Dr. Lichtbroun's other records, including long-term treatment and progress notes going back through the years when Kovach was employed, are consistent with these symptoms and conditions. (*See, e.g.*, R 609–664)

- January 2012 through August 2013 records from David Adin, D.O., a physician with the NJ Orthopedic Rehab and Pain Management Group, PC, reported restricted mobility in Kovach's neck and trunk, diminished reflexes in Kovach's right Achilles tendon, muscle spasms, and tenderness. In January 2012, Dr. Adin prescribed Kovach "Oxycodone 30 mg up to four times a day as needed," and "Soma 350 mg up to twice a day as needed to help with her muscle spasms and discomfort." (R 687) He discontinued the Soma in April 2012. (R 690) In November 2012, Dr. Adin stated that he had renewed Kovach's medication and that she would "likely require surgery for her lumbar spine." (R 694)) He also noted

that Kovac had recently received epidural injections from Dr. Freedman "with little benefit." (*Id.*) In December 2012, Dr. Adin noted that Kovach's symptoms "have been gradually worsening," and prescribed "Lyrica 150 mg twice a day along with the MS Contin 60 mg once a day and Oxycodone 30 mg four times a day as needed." (R 695) In July 2013, Dr. Adin noted that Kovach maintained her complaints of back pain and reported that "sitting for a prolonged period of time then attempting to stand, is most problematic for her." (R 700) The following month, Dr. Adin lowered Kovach's Lyrica prescription but increased the frequency of her Oxycodone prescription, also noting that Kovach received Ultram and Xanax prescriptions from Dr. Lichtbroun. (R 701)

I find ALJ Feuer's omission of this evidence problematic because "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citation omitted). Drs. Sinha, Adin, and Lichtbruon all treated Kovach on a continuing basis and their records support a gradual worsening of Kovach's alleged pain as well as an increasing dependence on a potent cocktail of medications to attempt to cope with her pain.[12]

On the other hand, Drs. Adin, Sinha, and Lichtbroun have not expressly opined that Kovach *cannot* perform some variety of sedentary work. ALJ Feuer essentially noted this much when he observed "[t]here is no medical opinion presented by claimant from a doctor stating that she cannot perform sedentary work." (R 20) ALJ Feuer also considered Kovach's ability to drive, care for her dog, walk 8–10 steps in her house, and perform other light household functions and childcare responsibilities—evidence he was entitled to weigh against Kovach's allegations of debilitating pain. (R 20)

---

[12]    State examining physician Mark Jacknin in fact noted Dr. Sinha's "extremely thorough and prolonged pain management effort," and the "sophisticated narcotic regimen" on which Dr. Sinha placed Kovach, which Dr. Jacknin credited as "proof of extreme pain." ALJ Feuer omits this evidence from his decision as well.

18

It is possible (but not certain) that the ALJ will arrive at the same RFC, properly, on remand. I think remand is nonetheless necessary to allow the ALJ to more carefully evaluate objective medical evidence supporting the "intensity, persistence, and limiting effects" of Kovach's allegedly severe and worsening pain, which is reasonably attributable to Kovach's documented spinal disc herniations and various documented pain and psychological disorders.[13]

### 4.    Disparity between RFC and Hypotheticals/Sitting Limitation

Turning to Kovach's fourth argument, she contends the hypothetical instruction ALJ Feuer provided to the VE was defective not only because her underlying RFC was defective, but also because the ALJ did not convey Kovach's actual RFC to the VE. In other words, Kovach claims the ALJ introduced a brand new error at step five; Kovach's RFC limited her to sitting for less than a full six hours in an eight-hour work day, but this limitation did not make its way into any of the hypotheticals ALJ Feuer posed to the VE. (*See* R 72–73)

The Commissioner dismisses Kovach's argument as a meritless attack on the ALJ's RFC, which the Commissioner claims was adequately captured in the ALJ's hypotheticals. (Opp 18–19) Even setting that aside, the Commissioner claims, substantial evidence in the record supports Kovach's ability to sit for a full six hours in an eight-hour workday, and therefore the disconnect between

---

[13]    Social Security Ruling ("SRR") 16-3P, similar to its predecessor ruling SSR 96-7p, instructs the Administration to evaluate the intensity, persistence, and limiting effects of an individual's symptoms by considering the following factors (i) daily activities, (ii) the location, duration, frequency, and intensity of pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (v) treatment other than medication for the symptoms, (vi) other measures used to relieve pain or other symptoms, and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. *Soc. Sec. Ruling 16-3p; Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Mar. 16, 2016); 20 C.F.R. §§ 404.1529, 416.929. ALJ Feuer's failure to discuss Kovach's long history of pain management, which includes a long list of medications and other treatments, is especially problematic in light of this directive.

what is stated in the RFC and what the ALJ told the VE is harmless error. (Opp 14–15)

The point is moot. I have already determined that the ALJ's assessment of Kovach's RFC did not properly consider all relevant and probative record evidence, and thus was not based on substantial evidence. Any further claims of error building on that RFC need not be considered. *See generally Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) ("[W]e . . . hold that the hypothetical did not accurately convey all of Ramirez's impairments, and the limitations they cause, and therefore the ALJ's decision is not supported by substantial evidence.").

For the guidance of future proceedings, however, I will state that I agree with Kovach that the ALJ introduced a new infirmity into the process at step five. ALJ Feuer should have specified in a hypothetical that Kovach could not sit for a full six hours. He did not.

Kovach reports that she has difficulty getting comfortable while sitting (R 22) and sometimes spends most or all of her day in bed. (R 63) I see no evidence undercutting these allegations (nor any acknowledgement of them in the ALJ's decision). State examining physician Dr. Jacknin opined that Kovach requires a five-minute break after every 15 minutes of standing or sitting. (R 109-113) Likewise, case analyst Cynthia Lefever concluded in March 2013 that Kovach "is limited to sedentary work by pain. However, she should also stand about every 15 minutes." (R 671)

In light of this evidence, not to mention ALJ Feuer's own conclusion at the RFC stage that Kovach *cannot* sit for a full six hours in an eight-hour work day, I do not think substantial evidence supports Kovach's ability to sit for a full six hours in an eight-hour work day. Therefore, the ALJ's omission of any sitting limitation from the hypotheticals was not harmless error and should be corrected as required on remand.[14]

---

[14]    Kovach also takes issue with ALJ Feuer's failure to specifically account for moderate mental limitations in the hypotheticals. For largely the same reasons I find that ALJ Feuer adequately accounted for Kovach's mental limitations in her RFC by

Finally, Kovach claims ALJ Feuer's errors are so egregious that I should reverse and award benefits directly rather than remand for further proceedings. (Br 17, 29–31)

I have outlined areas on which the ALJ should focus on remand. The ALJ's conclusions were the product of an incomplete review and a defective fifth step, and additional evidence may be necessary to fully develop the record. That development is necessary for a proper consideration of the case. Therefore, I decline to directly award Kovach benefits.

### III.   CONCLUSION

For the foregoing reasons, the ALJ's decision is REMANDED for further proceedings. An appropriate order accompanies this Opinion.

Dated: March 22, 2017

**KEVIN MCNULTY**
**United States District Judge**

---

limiting her to "simple, routine and repetitive tasks," I find that he adequately accounted for her moderate mental limitations by limiting her in the third hypothetical to "unskilled work because of concentration problems associated with pain or the effects of pain medication." (R 73)